UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| LORRAINE BEELER, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:15-cv-01481-SEB-MJD |
| | ) | |
| NANCY A. BERRYHILL, in her official | ) | |
| capacity as Acting Commissioner, Social | ) | |
| Security Administration, and | ) | |
| SOCIAL SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON MOTIONS FOR SUMMARY JUDGMENT (DKTS. 92, 94)**

The Social Security Administration (SSA) and its acting Commissioner Nancy A. Berryhill, Defendants here, enforce a policy by which the amounts of Plaintiffs' Social Security retirement benefits are reduced because they also receive benefits from two Canadian social security plans, the Canada Pension Plan (CPP) and the Québec Pension Plan (QPP). Plaintiffs object to those reductions, which is the gist of this litigation. By crossmotions for summary judgment, *see* Fed. R. Civ. P. 56(a), the parties respectively seek judgment in their favor based on our determination of a single issue: Are those reductions lawful?

We conclude that they are.

## <u>Background</u>

The material facts are few and undisputed. The twelve named Plaintiffs are each dual citizens of the United States and Canada. They instituted this action on their own

behalf and on behalf of the class of all persons whose Social Security retirement benefits are reduced because of their or their spouses' receipt of CPP/QPP benefits. Dkt. 129 (certifying Fed. R. Civ. P. 23 class). Plaintiffs or their spouses spent part of their working careers in Canada and part in the United States. While working in Canada, they paid social security taxes to Canada and not to the United States; while working in the United States, they paid social security taxes to the United States and not to Canada. (Both parties acknowledge this fact but neither has included it in their fact statements under S.D. Ind. L.R. 56-1(a). We take it from the operative complaint. Dkt. 65. ¶¶ 47–48, 57–58, 65–66, 71–72, 78, 84–85, 90–91, 95, 100–02, 105–08, 111–14, 120–22. A plaintiff is bound by her complaint allegations as judicial admissions, even at summary judgment. *Soo Line R.R. Co. v. St Louis Sw. Ry. Co.*, 125 F.3d 481, 483 (7th Cir. 1997) (citations omitted). And a judicially admitted fact is "withdraw[n] . . . from contention." *Keller v. United States*, 58 F.3d 1194, 1198 n.8 (7th Cir. 1995) (internal quotation marks and citation omitted).) Plaintiffs' or their spouses' work stints in each country were sufficient to qualify them to receive retirement benefits from each country's social security system independently. SSA reduces Plaintiffs' U.S. benefit payments based on their receipt of benefit payments from Canada.

This is an action for judicial review of SSA's adverse benefit decisions. *See* 42 U.S.C. § 405(g). Exhaustion of administrative remedies has been judicially waived. Dkt. 82. Each side has moved for summary judgment in its favor. Dkt. 92 (Plaintiffs), Dkt. 94 (Defendants). We resolve these motions below.

### **Standard of Decision**

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Questions of statutory interpretation upon undisputed facts are particularly suited for summary judgment. *See, e.g., LTV Steel Co. v. Nw. Eng'g & Constr., Inc.*, 41 F.3d 332, 334 (7th Cir. 1994); *Shefts v. Petrakis*, 954 F. Supp. 2d 769, 773–74 (C.D. Ill. 2013).

## <u>Analysis</u>

"As a general rule, workers in the United States are taxed to support the payment of social security benefits to the retired and to individuals with disabilities." *Eshel v. Comm'r*, 831 F.3d 512, 514 (D.C. Cir. 2016). Employment taxed to support Social Security is "covered" employment; employment exempt from Social Security taxes (or "contributions," as they are often called) is "noncovered" employment. *Stroup v. Barnhart*, 327 F.3d 1258, 1259 (11th Cir. 2003) (Cudahy, J.). *See* I.R.C. § 3101(a) (imposing Federal Insurance Contributions Act (FICA) tax on "wages" from "employment"); *id.* § 3121(a) (defining "wages" for purposes of FICA); 42 U.S.C. § 409(a) (defining "wages" identically in relevant respects for purposes of Social Security); I.R.C. § 3121(b) (defining "employment" for purposes of FICA); 42 U.S.C. § 410(a) (defining "employment" identically for purposes of Social Security). A retired worker is entitled to Social Security retirement benefits based on the number of calendar quarters during which she earned wages from employment subject to Social Security contribution requirements over the course of her career, provided she has accrued a minimum number of quarters of coverage. *See* 42 U.S.C. §§ 402(a), 414(a).

"[T]o preserve the progressive nature of the Social Security system by ensuring that the formula [SSA] uses to calculate benefits does not advantage high-income workers who split their careers between covered and non-covered employment over those who paid Social Security taxes for their entire careers[,]" Congress wrote into the Social Security Act ("the Act"), 42 U.S.C. ch. 7, a "windfall elimination provision" (WEP), "which reduces the benefits received by certain individuals who also receive pensions for work that did not require them to pay [S]ocial [S]ecurity taxes." *Hawrelak v. Colvin*, 667 F. App'x 161, 162 (7th Cir. 2016) (mem.) (citing *inter alia Stroup*, 327 F.3d at 1259). As explained in the conference report of the Social Security Amendments of 1983, Pub. L. No. 98-21, sec. 113, 97 Stat. 65, 76–79, the statute which added the WEP,

> Social security benefits are determined through a formula based on average lifetime earnings in jobs covered by Social Security. The benefit formula is weighted so that persons with low average life-time earnings receive a proportionally higher rate of return on their contributions to Social Security than workers with relatively high average lifetime earnings.
>
> Workers with short periods of covered work also receive this advantage, because their few years of earnings are averaged over a 35-year period to determine their average monthly covered earnings on which the benefit is based.
>
> This high rate of return for persons who have spent a short period of time in covered employment is what is often characterized as a "windfall" benefit.

H.R. Rep. No. 98-47, at 120 (1983) (Conf. Rep.) (capitalization regularized), *as reprinted in* 1983 U.S.C.C.A.N. 404, 409.

The WEP provides that a worker's Social Security retirement benefits are to be reduced according to a certain formula if the worker "becomes eligible . . . for a monthly

periodic payment . . . which is based in whole or in part upon his earnings for service which did not constitute 'employment' as defined in section 410 of this title for purposes of this subchapter [42 U.S.C. §§ 401–434, title II of the Act] (hereafter . . . referred to as 'noncovered service')[.]" 42 U.S.C. § 415(a)(7)(A). The WEP contains three exclusions, one of which is relevant here: the WEP does not apply to "a payment by a social security system of a foreign country based on an agreement concluded between the United States and such foreign country pursuant to section 433 of this title[.]" *Id.* § 415(a)(7)(A)(II).

There are two questions presented in this case: Does the WEP generally reach Plaintiffs' CPP/QPP benefits and, if so, are Plaintiffs' CPP/QPP benefits specifically excluded from its reach? In other words, (1) Does SSA err in holding that Plaintiffs' CPP/QPP benefits are payments "based in whole or in part upon . . . earnings for service which did not constitute 'employment' as defined in section 410," 42 U.S.C., section 210 of the Act? And, if not, (2) Does the SSA err in holding that Plaintiffs' CPP/QPP benefits are not payments "by a social security system of a foreign country based on an agreement concluded between the United States and such foreign country pursuant to section 433," 42 U.S.C., section 233 of the Act?

In discerning Congress's intent behind the cited provisions of the Act, "[t]he starting point is the existing statutory text[.]" *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004). To support and confirm our reading of that text, we rely in part on the conference report of section 210(a)(C) "because it is the most persuasive evidence of congressional intent besides the statute itself." *Resolution Tr. Corp. v. Gallagher*, 10 F.3d 416, 421 (7th Cir. 1993). Similarly, the goal of treaty interpretation is "'to ascertain the intent of the

parties' by looking to the document's text and context." *Lozano v. Montoya Alvarez*, 572 U.S. 1, 11 (2014) (quoting *United States v. Choctaw Nation*, 179 U.S. 494, 535 (1900)). Agreements established under section 233 of the Act are interpreted along the same lines. *Eshel*, 931 F.3d at 518.

> **I.    Does SSA err in holding that Plaintiffs' CPP/QPP benefits are payments "based in whole or in part upon . . . earnings for service which did not constitute 'employment' as defined in" section 210 of the Act?**

Section 210 of the Act sets forth the definition of "employment" for the purposes of title II of the Act, that is, the definition of covered employment. 42 U.S.C. § 410(a). That point bears repeating. Section 210 does not define "employment" as an abstract concept or a dictionary entry, detached from coverage by Social Security taxes, *compare id. with* I.R.C. § 3121(b) (identical definitions of "employment"), elsewhere divided into the species "covered employment" and "noncovered employment." Recall that the WEP glosses "service which did not constitute 'employment'" within the meaning of section 210 as "noncovered service." 42 U.S.C. § 415(a)(7)(A). As the WEP thus recognizes, section 210 sets forth the definition of "employment" as covered employment, that is, employment subject to Social Security contribution requirements. *See, e.g., Martin v. Soc. Sec. Admin., Comm'r*, 903 F.3d 1154, 1163 (8th Cir. 2018) (glossing "'employment' as defined in section 410," 42 U.S.C. § 415(a)(7)(A), as "[covered employment]"); *Newton v. Shalala*, 874 F. Supp. 296, 298 (D. Or. 1994) (glossing "earnings for service which did not constitute 'employment,'" 42 U.S.C. § 415(a)(7)(A), as "[i.e., earnings not subject to Social Security tax]"), *aff'd sub nom. Newton v. Sec'y of Health & Human*

*Servs.*, 70 F.3d 1114 (9th Cir. 1995) (mem.); *Paruch v. Harris*, 520 F. Supp. 1, 2

(E.D.N.Y. 1980) (Section 210 "defin[es] covered employment[.]").

Generally, employment is service to an American employer anywhere or service to

any employer in America. *See* 42 U.S.C. § 410(a)(A)–(B). Plaintiffs' service to Canadian

or other foreign employers in Canada obviously does not qualify. But section 210 also

provides that "[t]he term 'employment' means . . . any service, of whatever nature, . . . if

it is service, regardless of where or by whom performed, which is designated as

employment or recognized as equivalent to employment under an agreement entered into

under" section 233 of the Act. *Id.* § 410(a)(C).

Section 233 of the Act authorizes the President

> to enter into agreements establishing totalization
> arrangements between [the U.S. social security system] and
> the social security system of any foreign country, for the
> purposes of establishing entitlement to and the amount of old-
> age, survivors, disability, or derivative benefits based on a
> combination of an individual's periods of coverage under [the
> U.S. social security system] and the social security system of
> such foreign country.

*Id.* § 433(a).

"Totalization agreements provide for the grant of retirement benefits to persons

who split their careers among two or more countries and thus lack sufficient periods of

covered employment under each country's retirement system to qualify for benefits."

*Hawrelak*, 667 F. App'x at 163. To this end,

> Section 433 treats contributions to different countries' social
> security systems as establishing "periods of coverage," which
> are "period[s] of payment of contributions or [periods] based
> on wages for employment or on self-employment income[.]"

> 42 U.S.C. § 433(b)(2). Under a totalization agreement, employment creates a "period of coverage" under the social security system of one of the two signatories, but not both. *Id.* § 433(c)(1)(B)(I). That is, under Section 433, a citizen working in a foreign country makes payments to—and accrues periods of coverage under—only one social security system at a time. Periods of coverage accrued under a foreign system may be combined with periods of coverage under the United States system "for the purposes of establishing entitlement" to United States social security benefits. [*Id.*] § 433(c)(1)(A).

*Eshel*, 831 F.3d at 514–15 (last alteration added).

The United States and Canada are parties to a totalization agreement. Agreement with Respect to Social Security, Can.-U.S., Mar. 11, 1981, 35 U.S.T. 3405 (attached to order as Exhibit 1) [hereinafter Totalization Agreement]. Consistent with articles II and XX of the Totalization Agreement, *see* art. II, ¶ 4, the United States and the Canadian province of Québec entered into a separate understanding respecting U.S. Social Security and the QPP. Understanding on Social Security, Que.-U.S., Mar. 30, 1983, 35 U.S.T. 3448 (attached to order as Exhibit 1) [hereinafter Understanding]. The Totalization Agreement and the Understanding do not differ materially for our purposes, so we will discuss and cite the Totalization Agreement only unless context requires otherwise.

Before turning to this instrument, however, we first must address Defendants' argument that, "assuming that the Totalization Agreement is self-executing, it by no means contains the type of explicit language necessary to overcome the presumption that treaties do not create private rights or provide for private causes of action in U.S. courts." Defs.' Br. Supp. 29 (citing *Medellín v. Texas*, 552 U.S. 491, 504–06 (2008)). That is true enough but irrelevant. Plaintiffs are not seeking to hold the United States to its

international commitments in the abstract; they are complaining of a reduction in their retirement benefits by SSA. And Plaintiffs have a statutory cause of action for judicial review of adverse SSA decisions which are contrary to law (defeating as well Defendants' half-hearted sovereign-immunity argument raised in a footnote, Defs.' Br Supp. 28 n.10). 42 U.S.C. § 405(g); *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (citing *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002)).

Executive agreements (such as totalization agreements, *Eshel*, 831 F.3d at 518) are law—that is, part of our domestic or municipal law—if they are sufficiently analogous to treaties as defined by the Constitution, art. II, § 2, cl. 2, and if they are self-executing—that is, effective without further congressional action. U.S. Const. art. VI, § 1, cl. 2 ("[A]ll Treaties . . . shall be the supreme Law of the Land[.]"); *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 416 (2003) ("[V]alid executive agreements are fit to preempt state law, just as treaties are[.]"); *Weinberger v. Rossi*, 456 U.S. 25, 30 n.6 (1982) ("[Executive agreements] may in appropriate circumstances have an effect similar to treaties in some areas of domestic law."); *Dames & Moore v. Regan*, 453 U.S. 654, 686–88 (1981) (upholding self-executing executive agreement with Iran); *Islamic Republic of Iran v. Boeing Co.*, 771 F.2d 1279, 1283 (9th Cir. 1985) (factors relevant in determining when executive agreement self-executing); *United States v. Sum of $70,990,605*, 234 F. Supp. 3d 212, 233 (D.D.C. 2017) ("The Court starts from the premises that the President has the power, at least at times, to make sole executive agreements, and that some, but not all, executive agreements are self-executing.").

Defendants have not argued that the Totalization Agreement is not a constitutionally valid international agreement, nor that it is not self-executing (indeed, as noted, they assume that it is). Their declination is wise, for such arguments would likely fail. As to the first point, Professor Christians explains,

> [Social security totalization agreements (SSTAs)] are pre-authorized by Congress pursuant to the Social Security Act and associated regulations. In essence, an SSTA (like any other executive agreement) is simply a statute—written by the executive branch like a treaty, but enacted into law by virtue of a procedure involving the whole Congress rather than the Senate alone. These statutes are implemented first by the State Department, which identifies potential contracting states and initiates the negotiation process. SSTAs are negotiated by staff of the Office of International Programs, a division of the SSA. The authorizing statute allows for fast-track enactment: SSTAs automatically become law sixty session days after being submitted by the President to Congress unless objection arises in the House or the Senate in the form of a resolution of disapproval. [42 U.S.C. § 433(e)(2).] Thus, SSTAs are automatically approved unless Congress acts to prevent their enactment, which it has never done. Like treaties, SSTAs are [at least] bilateral so they cannot enter in force and therefore become law until all enumerated conditions are satisfied, including ratification by the other contracting state.

Allison Christians, *Taxing the Global Worker: Three Spheres of International Social Security Coordination*, 26 Va. Tax Rev. 81, 90–91 (2006) (footnote citations omitted).

It would be difficult to regard this procedure of statutory pre-authorization plus postnegotiation congressional ratification as a constitutionally deficient blessing for a "valid executive agreement," *Garamendi*, 539 U.S. at 416, possessing "'a similar dignity' to [article II] treaties," *Sum of $70,990,605*, 234 F. Supp. 3d at 233 (quoting *United States v. Pink*, 315 U.S. 203, 230 (1942)), so as to be eligible for domestic enforceability.

*See Garamendi*, 539 U.S. at 415 ("congressional acquiescence" by inaction may validate executive agreements); *Dames & Moore*, 453 U.S. at 674, 680, 682 ("specific congressional authorization," "implicit [congressional] approv[al]," and "congressional acquiescence" by inaction may validate executive agreements).

As for whether the Totalization Agreement is in fact domestically enforceable because self-executing, as illustrated somewhat below, the mandatory, directive language of the rules laid down by the Totalization Agreement "act[s] directly" on its subjects, rather than merely "pledg[ing] the faith of the United States to pass acts which shall ratify and confirm" those rules, and so would likely merit a finding of self-execution. *Foster v. Neilson*, 27 U.S. (2 Pet.) 253, 314 (1829) (Marshall, C.J.). *See Medellín*, 552 U.S. at 504–05, 508–09 (applying *Foster*).

Looking beyond the case at bar, we note that SSA does not appear to harbor any doubts as to the validity of a totalization agreement duly executed under section 233. *See, e.g.,* 20 C.F.R. § 404.1901(b) (introducing provisions for "negotiation and administration of totalization agreements"). Nor has SSA apparently awaited any further congressional action before enforcing the provisions of totalization agreements. *See, e.g., id.* § 404.1908(b)(1) ("Generally, a quarter of coverage . . . will be credited for every 3 months . . . of coverage in a reporting period certified to SSA by the other country's agency."). SSA's own view, then, appears to be that totalization agreements are both valid international agreements and binding upon it without more; that is, that totalization agreements are law. We conclude that, if SSA has acted contrary to that law in reducing

Plaintiffs' retirement benefits, Plaintiffs are entitled to relief from this Court. 42 U.S.C. §

405(g); *Lopez*, 336 at 539 (citing *Sims*, 309 F.3d at 428).

To the Totalization Agreement itself we now turn. Its declared purpose is "co-

operat[ion]" between Canada and the United States "in the field of social security[.]"

Totalization Agreement, pmbl. Except as its terms provide otherwise, it applies to

Canadian and U.S. citizens; refugees; stateless persons; "[o]ther persons with respect to

the rights they derive from a national of either Contracting State, a refugee or a stateless

person"; and "[n]ationals of a State other than a Contracting State who are not included

among the persons referred to" in the immediately preceding provision. *Id.*, art. III. This

declared breadth of scope thus clearly refutes SSA's position that the Totalization

Agreement operates only where workers receive totalized benefit payments. Defs.' Br.

Supp. 28.

Plaintiffs argue that the Totalization Agreement "plainly designates and

recognizes as equivalent to employment paid work in both countries." Pls.' Br. Supp. 9.

If that were so, all paid work in Canada would be covered employment under the Act via

section 210(a)(C), no matter by whom or for whom performed, and no matter whether the

employee had made any contributions to U.S. Social Security during the period of her

paid work in Canada. And if *that* were so, Plaintiffs' CPP/QPP benefits would not

constitute payments "based in whole or in part upon . . . earnings for service which did

not constitute 'employment' as defined in" section 210. 42 U.S.C. § 415(a)(7)(A). The

WEP would thus not reach Plaintiffs' CPP/QPP benefits, *id.*, and Plaintiffs would be

entitled to judgment.

The Totalization Agreement does not, however, designate as covered employment, or recognize as equivalent to covered employment, paid work in both countries, plainly or otherwise. Plaintiffs do not, because they cannot, point to specific language in the Totalization Agreement to that express effect. Plaintiffs rather point to the structure and purpose of the Totalization Agreement as a whole, indeed to the structure and purpose of any totalization agreement. *See* Pls.' Reply Br. 5 ("[S]uch agreements [*i.e.*, totalization agreements] plainly designate 'employment' to cover all periods of employment ('periods of coverage') . . . ."). But Plaintiffs have fundamentally misconceived this structure and purpose in their briefing.

In their fullest treatment of the argument, Plaintiffs contend,

> In reducing Plaintiffs' benefits, SSA failed to recognize the coverage of employment under the social security laws listed in Article II in the "General Provisions" section of the [Totalization Agreement]. The definition of "period of coverage" in Article I of the same section pertains to employment or self-employment "as defined or recognized as a period of coverage by the laws under which such period has been completed," in this case, the U.S. and Canadian social security laws. The section "Provisions on Coverage," or Articles V and VI, address, among other things, the prevention of dual coverage/taxation in regard to employment or self-employment covered in Articles I and II. Benefit totalization is addressed in Articles VII and VIII in the section "Provisions on Benefits." The prevention of dual coverage/taxation and benefit totalization cannot be confused with the coverage of employment or self-employment in Articles I and II.

Pls.' Br. Supp. 13–14.

The Totalization Agreement defines "period of coverage" basically identically to the Act's definition, 42 U.S.C. § 433(b)(2), as follows:

> 'Period of coverage' means, a period of payment of
> contributions or a period of earnings from employment or
> self-employment, as defined or recognized as a period of
> coverage by the laws under which such period has been
> completed, or any similar period insofar as it is recognized by
> such laws as equivalent to a period of coverage; a period of
> residence shall not be recognized as a period of coverage[.]

Totalization Agreement, art. I, ¶ 6. Outside this definition, the defined term "period of

coverage" appears only once in the Totalization Agreement, in relation to a certain class

of spouses and dependents. *Id.*, art. VI, ¶ 2. Article II provides that "laws" for the

purposes of the Totalization Agreement means the social security laws of the United

States and Canada, including title II of the Act, 42 U.S.C. §§ 401–434, and related

provisions of the Internal Revenue Code. *Id.*, art. II, ¶¶ 1–3.

Plaintiffs' argument, which is less than pellucid, appears to be that "paid work"

approximates a dictionary definition of "employment" (though whence precisely

Plaintiffs have drawn this phrase is unknown, for it appears neither in the Totalization

Agreement nor in the cited sections of the Act); the Totalization Agreement recognizes

that paid work may occur in either country and may give rise to periods of coverage

under the social security laws of either country; therefore, the Totalization Agreement

recognizes paid work in both countries as equivalent to "'employment' as defined in

section 410," or covered employment. 42 U.S.C. § 415(a)(7)(A). Plaintiffs' upshot is

clear, in any event: a period of coverage in one country counts as a period of coverage in

the other; "covered" in one country *ipso facto* means "covered" in the other. Pls.' Br.

Supp. 6 ("Because Plaintiffs' benefits are based on earnings for service that constitutes

employment or self-employment under Canadian or Québec law, the Social Security Act

also recognizes those services as employment or self-employment, *i.e.* covered service."), 20 ("[B]ecause the [Totalization Agreement] designates and recognizes as equivalent to employment paid work in either country, work in Canada as a Canadian resident is not 'non-covered employment' and does not trigger application of the WEP[.]").

In fact, the Totalization Agreement lays down exactly the opposite rule: "covered" in one country *ipso facto* means "noncovered" in the other. Plaintiffs overlook or misunderstand the statutory command that "employment" under any totalization agreement "shall . . . result in a period of coverage" under either the foreign or the domestic social security system, "*but not under both*[.]" 42 U.S.C. § 433(c)(1)(B)(i) (emphasis added). To effectuate this command, section 233 requires that a totalization agreement establish "the methods and conditions for determining under which system," foreign or domestic, a period of coverage arises. *Id.* § 433(c)(1)(B)(ii). The Totalization Agreement's solution to this choice-of-law problem is classically territorial. It chooses, with exceptions, *lex loci operarum*, the law of the place of employment: "Except as otherwise provided in this Article, an employed person who works in the territory of one of the Contracting States shall, in respect of that work, be subject to the laws of only that Contracting State." Totalization Agreement, art. V, ¶ 1. (The same rule obtains in all totalization agreements to which the United States is a party. Christians, *supra*, at 94.) Thus, in general, an employee working in Canada accrues coverage subject to Canada's social security laws; an employee working in the United States accrues coverage subject to the Act.

As noted, there are exceptions to the general rule of territoriality. For example, if an employee working in the United States is sent by her employer to work in Canada, she continues to accrue coverage under the Act, not under Canada's social security laws, unless her time abroad exceeds sixty months. *Id.*, art. V, ¶ 2(a). This is a useful example of "service, regardless of where or by whom performed, which is designated as employment or recognized as equivalent to employment" under a totalization agreement. 42 U.S.C. § 410(a)(C). Absent the Totalization Agreement, the employee's work in Canada (assuming her employer is not American) would not be "'employment' as defined in section 410," or employment covered by U.S. Social Security. *Id.* § 415(a)(7)(A). *See id.* § 410(a)(A)–(B). The Totalization Agreement "designate[s] as [covered] employment or recognize[s] as equivalent to [covered] employment," *id.* § 410(a)(C), the employee's otherwise noncovered service in Canada by causing her to "be subject to the laws of only [the United States] in respect of that work," Totalization Agreement, art. V, ¶ 2(a); that is, by causing her otherwise noncovered service to be covered under the Act and subject to Social Security contribution requirements. I.R.C. §§ 3101(a), 3121(b)(C).

This reading of the text of section 210(a)(C) is supported by its legislative history. Section 210(a)(C) was written into the Act by the Social Security Amendments of 1983, Pub. L. No. 98-21, sec. 322(a)(1), 97 Stat. 65, 120–21. (As already noted, the WEP was added by the same statute. Sec. 113, 97 Stat. at 76–79.) The conference report's summary of then-current law noted that, "through an inadvertent drafting error[,] earnings that are intended to be covered under [U.S. Social Security] pursuant to an international social

security agreement [*i.e.*, a totalization agreement] are not covered because U.S. Social Security taxes cannot be imposed on the earnings." H.R. Rep. No. 98-47, at 150 (1983) (Conf. Rep.) (capitalization regularized), *as reprinted in* 1983 U.S.C.C.A.N. 404, 440. Section 210(a)(C), in concert with an identical amendment to the definition of "employment" in the Internal Revenue Code, sec. 322(a)(2), 97 Stat. at 121 (amending I.R.C. § 3121(b)), were intended to remedy the problem by "provid[ing] for the imposition of Social Security taxes if an international social security agreement provides for coverage under the U.S. Social Security System." H.R. Rep. No. 98-47, at 150 (capitalization regularized), *as reprinted in* 1983 U.S.C.C.A.N. at 440. The conference report thus confirms that a totalization agreement "designate[s] as employment or recognize[s] as equivalent to employment," 42 U.S.C. § 410(a)(C), when it subjects an employee's otherwise noncovered service to coverage and contribution under the Act.

Plaintiffs argue further that SSA's application of the WEP to their CPP/QPP benefits violates article IV of the Totalization Agreement because Canada does not reciprocally reduce Plaintiffs' CPP/QPP benefits based on their U.S. Social Security benefits. *See* Dkt. 92 Ex. 1 (Plaintiffs' declarations). Article IV provides in relevant part as follows:

> Unless otherwise provided in this Agreement, the persons designated in Article III (a) ["Nationals of either Contracting State"], (b) ["Refugees"], (c) ["Stateless persons"] or (d) ["Other persons with respect to the rights they derive from a national of either Contracting State, a refugee or a stateless person"] who reside in the territory of either Contracting State shall, in the application of the laws of a Contracting State, receive equal treatment, with respect to the payment of benefits, with the nationals of that Contracting State.

17

Totalization Agreement, art. IV, ¶ 1. Whatever Plaintiffs' construction of this provision may be, it unambiguously does not entitle them to any relief. Article IV says that the United States may not discriminate in the payment of Social Security benefits in favor of its own citizens against Canadians, refugees, stateless persons, or their spouses and dependents living either in the United States or Canada. There is no evidence or even any contention that SSA applies the WEP to Canadians (or refugees or stateless persons or their spouses and dependents) in circumstances where it would not also apply the WEP to Americans. Plaintiffs' argument on this point fails.

The weakness of Plaintiffs' reasoning is on clear display in the decision of an administrative law judge (ALJ) purporting to adopt it. In a "Notice of Supplemental Authority," Dkt. 131, Plaintiffs have tendered the decision of an ALJ reversing SSA's application of the WEP to the claimant's Social Security retirement benefits. Dkt. 131 Ex. 1. The claimant was represented by Plaintiffs' counsel, Dkt. 131, at 1, who appears to have advanced the same arguments before the ALJ as before us. The ALJ put the case as follows:

> The claimant was born on February 12, 1950, and worked in Belgium from 1972 through 1992. This was sufficient to become fully eligible for Belgian social security retirement benefits. He emigrated to the United States in 1993 and began working under the retirement provisions of Social Security Act in 1994, and did so through 2016, earning 80 quarters of coverage towards U. S. retirement. The United States and Belgium have entered into a Totalization Agreement. The purpose of the agreement is to provide a retiree who has worked in the two countries with the ability to combine quarters of coverage from the two nations in order to qualify for a pension, where he would not otherwise have been able to do so. The claimant was not working for an American

company in Belgium, and his earnings in Belgium were therefore not covered by the Social Security Act. (20 CFR 404.1004(a)). Section 210 of the Social Security Act, (42 USC 410), provides that (a) employment means any service irrespective of citizenship or residence in the United States, (c) regardless of where or by whom performed.

[SSA's] Program Operations Manual System RS 00605.386 provides that WEP will not apply to workers in countries where there is a Totalization Agreement when the claimant is entitled to a regular U. S. benefit as well as a foreign benefit, and not receiving any other pension based on noncovered work. The claimant argues that his work was covered by the Belgian retirement system and as such is covered work. He argues further that the agreement requires reciprocity of treatment, (Article 3 of The Agreement): the claimant testified that a Belgian citizen would not be subject to a WEP if receiving U. S. benefits in Belgium. He was fully qualified for a Belgian pension and fully qualified for a U. S. pension, independently of one another.

Section 215(a)(7) of the Act [*i.e.*, the WEP] provides for a reduction formula for those qualifying for Social Security and a pension based on noncovered employment. This more commonly applies to U. S. workers under a retirement plan provided by a local county or state government, independent school district, railroad retirement, or other such entity. Its purpose is to eliminate an unintended advantage that Social Security gives to workers with low earnings, or who have not satisfied the ordinarily required quarters of coverage due to age or other agreement allowances with these local authorities. The low wage earners in these cases receive a heavily weighted benefit for wages earned over a short time, compared to those qualifying under the regular system. The equalizing factor is the reduction by the Windfall Elimination Provision. (WEP). The claimant is not seeking to defeat the purpose of the provision, and is not receiving an advantage over other workers. He has fully qualified under both the Belgian and U. S. systems. To apply the provision to him unduly penalizes him for 44 years of covered service.

[SSA] argues that the participation of Belgium and the U. S. in the Totalization Agreement is the trigger of the WEP by its very existence, whether or not it applies herein, even though the claimant's quarters of coverage were not totalized. 42

USC section 415(a)(7)(E) states, however, that WEP shall not apply to a totalized benefit because each country pays a portion of the totalized benefit amount. 42 USC section 433(c)(l)(c). It follows that if each country pays the entire amount of two separate programs in their respective countries, the WEP would not apply as well. The claimant's attorney . . . notes that each country recognizes the quarters of coverage of the other country under the Agreement. The Windfall Elimination Provision (Public Law 98-12) specifically states that the WEP does not apply to anyone with 30 years of coverage (YOC), as this is a specific exemption. There would be no advantage of weighting benefits after thirty years. The claimant's totalized quarters of coverage would substantially exceed 30 years in this instance. The claimant's employment was not "noncovered" service, as it was covered by the national retirement systems in both countries, and not by a private pension provider, as [SSA] has characterized it.

Dkt. 131 Ex. 1, at 6–7 (citation brackets changed to parentheses) (record citations omitted) (*sic passim*).

First, the ALJ begs the major premise of the entire argument by asserting, without analysis and without so much as a citation to the operative totalization agreement, that the claimant had "44 years of covered service." *Id.* at 7. Second, benefit reduction based on that part of the claimant's career during which he made no contributions to U.S. Social Security is the opposite of an "undue[] penal[ty]," *id.*; it is the very purpose of the WEP. Third, as will become clearer below, it does not follow that, because a totalized benefit payment is excluded from the WEP, nontotalized benefit payments from pensions for which the worker is independently fully eligible should be excluded from it as well. As our sister court for the District of Kansas has explained,

[t]hat argument ignores the different purposes of [the WEP and benefit totalization]. The [purpose of the] totalization

20

> provision [42 U.S.C. § 433(c)(1)] is to provide a social
> security benefit to potential beneficiaries who would not
> otherwise be eligible for benefits because of periods of
> employment insufficient to qualify under either of two
> systems. . . . The windfall elimination provision, on the other
> hand, is designed to preclude the payment of weighted (90%)
> benefits to a beneficiary with a relatively short career under
> social security who receives another pension based on
> substantial noncovered work. [Claimants who are] eligible for
> benefits under both systems [are] therefore[] not in need of
> the savings provisions of a totalization agreement. The
> purpose of the windfall elimination provision is applicable,
> but the purpose of the totalization provision is not applicable,

to claimants like Plaintiffs. *Vanlerberghe v. Apfel*, 82 F. Supp. 2d 1212, 1215 (D. Kan. 2000).

Plaintiffs have tendered another, similar ALJ decision in a different case. Dkt. 123 Ex. 1. Discussion of that opinion would not add significantly to our analysis here, however, as it appears to simply lift in conclusory fashion Plaintiffs' above-quoted assertions concerning the operation of articles I and II of the Totalization Agreement. *Id.* at 8 (holding with no analysis that "[t]he U.S./Canada Agreement designates as equivalent to employment paid work in both countries"). We do find it telling that even the proponents of Plaintiffs' argument have failed to give a coherent, cogent account of it. If a persuasive articulation of a legal position cannot be found among one lawyer and two judicial officers who propound it, likely that is because it has none. Plaintiffs also spill a good deal of ink discussing two tax cases, *Eshel* and *Erlich v. United States*, 104 Fed. Cl. 12 (2012), but these cases are either irrelevant or not supportive of Plaintiffs' position.

Finally, Plaintiffs' reliance on *Rabanal v. Colvin*, 987 F. Supp. 2d 1106 (D. Colo. 2013), is misplaced. That case, like this one, was an action for judicial review of an

adverse SSA decision, and concerned the interaction of a Spanish pension plan and the WEP's implementing regulation, 20 C.F.R. § 404.213, which provides in part that SSA will apply the WEP to "[p]ensions from noncovered employment outside the United States[,] includ[ing] both pensions from social insurance systems that base benefits on earnings but not on residence or citizenship, and those from private employers." *Id.* § 404.213(a)(3).

The court found that the Spanish plan paid benefits based on a worker's "contribution payments"; found nothing in the record suggesting that such "contribution payments" were based on "earnings," as required by the WEP, 42 U.S.C. § 415(a)(7)(A); faulted SSA for equating "earnings" with "work" in its internal operations manual as "not clearly justified"; and, rather than remand to SSA, entered judgment for the claimant because the ALJ had established as the law of the case that the Spanish pension "base[d] benefits on . . . residence or citizenship," 20 C.F.R. § 404.213(a)(3), by finding that the claimant's Spanish benefits were "based on his status as a citizen of Spain." 987 F. Supp. 2d at 1111–13. In dicta (they were dicta because even if rejected, the same result would obtain under the court's reasoning, *see United States v. Crawley*, 837 F.2d 291, 292–93 (7th Cir. 1988)), the court noted that the WEP's implementing regulation precludes application of the WEP to pensions from social security systems that base benefits on residence or citizenship, "*regardless of whether* [*they*] [*are*] *also based on earnings*." *Rabanal*, 987 F. Supp. 2d at 1112 (emphasis added).

Plaintiffs rely on these *Rabanal* dicta to argue that SSA has misinterpreted and misapplied the WEP's implementing regulation. It is not at all clear that the Colorado

district court's reading of the regulatory language "pensions from social insurance systems that base benefits on earnings but not on residence or citizenship," 20 C.F.R. § 404.213(a)(3), is the correct one. Even if we adopted *Rabanal*'s reading, Plaintiffs could prevail only if the CPP and QPP are in fact pensions based at least in part on residence or citizenship, a point which Defendants dispute persuasively. Defs.' Br. Supp. 18–21.

But the point is in any event immaterial. We have already concluded that SSA's application of the WEP to Plaintiffs' CPP/QPP benefits is lawful as a matter of the unambiguous text of the Act and the Totalization Agreement. There is thus no cause to address whether SSA's interpretation of the Act is reasonable under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), nor whether SSA's interpretation of the WEP's implementing regulation is plainly erroneous or inconsistent with it under *Auer v. Robbins*, 519 U.S. 452 (1997). "[T]he intent of Congress is clear, [so] that is the end of the matter[.]" *Chevron*, 467 U.S. at 842.

In sum, totalization agreements establish arrangements under which transnational workers pay into and accrue coverage under only one country's social security system at a time. Precisely because coverage by one country's system precludes coverage by the other's, benefit totalization under such agreements permits otherwise unfairly penalized workers to draw *one* pension in exchange for *one* career's worth of social security taxes, though paid to two different sovereigns. And, again, precisely because coverage by one country's system precludes coverage by the other's, the WEP precludes otherwise unfairly advantaged workers from drawing *two* pensions in exchange for *one* career's worth of social security taxes.

23

Plaintiffs' theory of entitlement would stand this entirely sensible system on its head. Plaintiffs would rewrite a provision designed to eliminate windfalls into a windfall guarantee: workers would receive benefits from a sovereign for work that by hypothesis the sovereign did not tax. Plaintiffs would further obviate the entire congressional design behind totalization agreements: if Plaintiffs' position were accepted, no benefit totalization or combination of periods of coverage would ever be required. All periods of coverage under the foreign social security system would translate into periods of coverage under the Act, and no transnational worker would ever fail to independently qualify for benefits under the Act where she would otherwise require totalization to receive benefits at all.

Plaintiffs' service to Canadian or other foreign employers in Canada was not covered employment. *See* 42 U.S.C. § 410(a)(A)–(B). The Totalization Agreement does not designate Plaintiffs' foreign service as covered employment or recognize it as equivalent to covered employment. *See id.* § 410(a)(C). SSA is therefore right to hold that Plaintiffs' CPP/QPP benefits are payments "based in whole or in part upon . . . earnings for service which did not constitute 'employment' as defined" in section 210 of the Act. 42 U.S.C. § 415(a)(7)(A).

**II.     Does the SSA err in holding that Plaintiffs' CPP/QPP benefits are not payments "by a social security system of a foreign country based on an agreement concluded between the United States and such foreign country pursuant to" section 233 of the Act?**

The WEP does not apply to "a payment by a social security system of a foreign country based on" a totalization agreement under section 233 of the Act. 42 U.S.C. §

415(a)(7)(A)(II). Plaintiffs' CPP/QPP benefit payments are not within the exclusion, however, because Plaintiffs are eligible to receive them independently, without resort to combination or totalization. They are thus not "based on" the Totalization Agreement. *Hawrelak*, 667 F. App'x at 163; *Vanlerberghe*, 82 F. Supp. 2d at 1214; *Newton*, 874 F. Supp. at 299. Plaintiffs do not argue the contrary. SSA is right to hold that Plaintiffs' CPP/QPP benefits are not payments "by a social security system of a foreign country based on" a totalization agreement. 42 U.S.C. § 415(a)(7)(A)(II)

## Conclusion and Order

The WEP applies to Plaintiffs' CPP/QPP benefits. The WEP's exclusions do not. For these reasons:

Plaintiffs' motion for leave to file a surreply, Dkt. 110, is GRANTED.

Plaintiffs' motion for summary judgment, Dkt. 92, is DENIED.

Defendants' motion for summary judgment, Dkt. 94, is GRANTED.

Final judgment will issue by separate document. Fed. R. Civ. P. 58(a).

IT IS SO ORDERED.

Date:    4/22/2019

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Aaron M. Bernay
FROST BROWN TODD LLC
abernay@fbtlaw.com

Jonathan Mark Bruce
LAW OFFICE OF JONATHAN BRUCE, LLC
bruce@jonathanbrucelaw.com

Darren Andrew Craig
FROST BROWN TODD LLC
dcraig@fbtlaw.com

Joseph J. Dehner
FROST BROWN TODD LLC
jdehner@fbtlaw.com

Kathryn E. Olivier
UNITED STATES ATTORNEY'S OFFICE
kathryn.olivier@usdoj.gov